# In the United States Court of Federal Claims

No. 11-333L
(Filed: October 11, 2011)

| | |
|---|---|
| WEST CHELSEA BUILDINGS, LLC, et al., Plaintiffs, v. THE UNITED STATES, Defendant. | Denying Class Certification; RCFC 23; Numerosity; Rails-to-Trails; National Trails System Act Amendments of 1983, 16 U.S.C. § 1247(d). |

*Mark Fernlund Hearne, II*, Clayton, MO, with whom were *Meghan S. Largent* and *Lindsay S.C. Brinton*, Clayton, MO, for plaintiffs.

*Emily M. Meeker*, United States Department of Justice, Washington, DC, with whom were *Ignacia S. Moreno*, Assistant Attorney General, for defendant. *Kristine S. Tardiff*, United States Department of Justice, Concord, NH, of Counsel.

## ORDER DENYING CLASS CERTIFICATION

**FIRESTONE**, *Judge*

Pending before the court is plaintiffs' motion to certify this matter as a class action pursuant to Rule 23 of the Rules of the United States Court of Federal Claims ("RCFC"). For the reasons that follow, the court holds that this matter is not appropriate for certification as a class action. Accordingly, the plaintiffs' motion is **DENIED**.

This case involves the "High Line" recreational trail in New York City, New York ("City"). On June 13, 2005 the Surface Transportation Board ("STB") issued a Certificate of Interim Trail Use or Abandonment ("CITU") that applied to a 1.45-mile railroad corridor in the borough of Manhattan. On November 4, 2011, the then-owner of the rail line, CSX Transportation, Inc. ("CSX"), and the City of New York entered into a Trail Use Agreement as authorized by the CITU. This Agreement eventually led to the construction of the High Line elevated recreational trail pursuant to the "railbanking" provision of the National Trails System Act Amendments of 1983, 16 U.S.C. § 1247(d) ("Trails Act").[1] The three named plaintiffs in this case are West Chelsea Building LLC,

---

[1] In this court's recent decision in Macy Elevator, Inc. v. United States, 97 Fed. Cl. 708 (2011), the court summarized the general purposes and operation of the Trails Act as follows:

> Congress enacted the Trails Act to address the national problem of a reduction in rail tracks. Preseault v. Interstate Commerce Comm'n, 494 U.S. 1, 5 (1990) ("Preseault I"). The Trails Act authorizes the [STB] to preserve railroad corridors or rights-of-way not currently in use for train service for possible future rail use by converting those rights-of-way into recreational trails. Id. at 5-6; 16 U.S.C. § 1241 (2006). In essence, the Trails Act allows a railroad to relinquish responsibility for a rail line by transferring the corridor to an entity that will use it as a recreational trail. Although the corridor is not used as a railroad during the period of interim trail use, it remains intact for potential future use for rail service. This process is called "railbanking."

Macy Elevator, 97 Fed. Cl. at 711 (internal footnote omitted). The court then explained that STB approval of railbanking and recreational trail use are authorized in connection with the STB's abandonment approval authority. In particular, the court explained that in cases where a railroad and a trail provider reach an agreement over recreational trail use of the rail line, the STB will retain jurisdiction over the rail corridor and the corridor will be railbanked for possible future rail use. In such cases, the rail corridor will not be returned to the underlying fee owner:

> Before a railroad corridor may be converted into a recreational trail, the railroad must either initiate abandonment proceedings with STB under 49 U.S.C. § 10903 (2006) (where the railroad has recently had operating train service) or seek an exemption from the ordinary abandonment procedures under 49 U.S.C. § 10502 (2006) (where the railroad has had no local rail service for at least two years).

22-23 Corp., and 26-10 Corp. Each alleges in the complaint that it has property that abuts or underlies the railroad corridor that was the subject of the June 13, 2005 CITU. They claim that the STB's issuance of the CITU has (a) forestalled or taken from them their state law "reversionary" interest; (b) appropriated an easement across their property for an interim public-access recreational trail; and (c) appropriated from them a potential railroad right-of-way and their right under New York law to exclusive use and physical occupation of their land. The plaintiffs on behalf of themselves and as the representatives of a class of similarly situated property owners who hold "an interest in the property

---

> Caldwell v. United States, 57 Fed. Cl. 193, 195 (2003) ("Caldwell I"), aff'd, 391 F.3d 1226 (Fed. Cir. 2004) ("Caldwell II"). Under either procedure, abandonment of the rail line and right-of-way will not be approved by the STB if a qualified trail provider submits to the STB a request to use the right-of-way as a recreational trail. If the trail provider submits a statement of willingness to assume financial and legal responsibility to the STB and the railroad, the STB will, in the case of an operating railroad issue a [CITU] which preserves the STB's jurisdiction over the rail corridor while the parties negotiate an Interim Trail Use Agreement. See 49 C.F.R. § 1152.29(c) (2010). In cases involving the exemption procedure, such as the present case, the STB issues a Notice of Interim Trail Use or Abandonment ("NITU"), which also preserves the STB's jurisdiction over the rail corridor, allows the railroad to discontinue operations and remove track and equipment, and affords the railroad and the trail provider 180 days to negotiate a railbanking and interim Trails Act Agreement. Caldwell II, 391 F.3d at 1229-30; Caldwell I, 57 Fed. Cl. at 195; 49 C.F.R. § 1152.29(d). During this period, the railroad will also negotiate an agreement for the transfer of the corridor to the trail operator. "If an agreement is reached, the NITU [or CITU] automatically authorizes the interim trail use. If the [STB] takes no further action, the trail sponsor then may assume management of the right-of-way, subject only to the right of a railroad to reassert control of the property for restoration of rail service." Caldwell I, 57 Fed. Cl. at 195 (internal citations omitted); see also 49 C.F.R. § 1152.29(d)(2). If an agreement is not reached, the railroad will be allowed to abandon the line, at which time the STB's jurisdiction over the right-of-way terminates.

Id. at 711-12 (internal footnotes omitted).

subject to the CITU issued on June 13, 2005," seek an award of the full fair market value of the property allegedly taken by the United States along with severance damages, interest, costs, and attorneys' fees.

**I. Background**

The creation of the High Line recreational trail has its roots in litigation that began in the late 1980s and early 1990s. The parties do not dispute that in 1989 a group of property owners, Chelsea Property Owners ("CPO"), sought to develop certain properties in the area surrounding an elevated train line in the Chelsea neighborhood of New York City. To that end, they filed an application with the Interstate Commerce Commission ("ICC"), the STB's predecessor, seeking to have the ICC authorize abandonment of the 1.45 mile train line. Chelsea Property Owners - Abandonment - Portion of the Consol. Rail Corp.'s W. 30th St. Secondary Track in New York, N.Y., 8 I.C.C.2d 773 (1992), aff'd sub nom. Consol. Rail Corp. v. ICC, 29 F.3d 706 (D.C. Cir. 1994). Conrail, the operator of the rail line, opposed the application, but the ICC granted the CPO's application subject to certain conditions. Id. at 791-792. The CPO was not able to meet those conditions until 2002 when its second motion for a certificate of abandonment was filed. This led to extensive negotiations with CPO, a group called Friends of the High Line, New York City, and CSX, the then-owner of the rail line. Eventually, opposition to the creation of the High Line recreational trail ended and, on June 13, 2005, a CITU was issued. Thereafter, on November 4, 2005, CSX and the City of New York entered into a Trail Use Agreement.

After the STB issued the CITU in June 2005, New York City created a Special West Chelsea District to "facilitate the restoration and reuse of the High Line elevated rail line as an accessible, public open space through . . . High Line improvement bonuses and the transfer of development rights from the High Line Transfer Corridor." The legislation creating the Special West Chelsea District also created the High Line Transfer Corridor to "enable the transfer of development rights from properties over which and immediately to the west of where the High Line passes."

Public real estate records show that each of the named plaintiffs conveyed an easement to New York City on November 4, 2005, to allow for development, construction, and maintenance of the proposed High Line recreational trail. In addition, each named plaintiff executed on that same date a "Release, Waiver, and Consent Not to Sue Agreement" with New York City, in which they each agreed not to bring a suit related to the High Line against New York City. They also agreed in that document not to sue the United States for compensation with respect to the High Line. The agreement states in part that they will "not . . . sue or join any action seeking compensation from, and will not participate with and will withdraw from any class action seeking compensation from the City or the United States . . . with respect to the Highline CITU." Def.'s Resp. Ex. 7, at 3, ECF No. 18-4.

Finally, each of the named plaintiffs received and later transferred the development rights they received as property owners under the 2005 City legislation that created the West Chelsea District. The amount of payment they received is not now known. However, in the documents transferring development rights the plaintiffs again

agreed not to sue the United States in connection with the use of the High Line for Public Space.

The plaintiffs filed the present suit on May 24, 2011, nearly six years after the CITU was issued and shortly before the statute of limitations would have run under 28 U.S.C. § 2501.[2] The motion for class certification was filed on June 6, 2011. Following briefing, oral argument was heard on the motion on October 6, 2011.

## II. Standards for Decision

Class actions in this court are governed by RCFC 23. Under RCFC 23, the criteria for a class action are as follows:

> (a) Prerequisites. One or more members of a class may sue as representative parties on behalf of all members only if:
>
> > (1) the class is so numerous that joinder of all members is impracticable;
> > (2) there are questions of law or fact common to the class;
> > (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
> > (4) the representative parties will fairly and adequately protect the interests of the class.
>
> (b) Class Actions Maintainable. A class action may be maintained if RCFC 23(a) is satisfied and if:
>
> > . . .
> > (2) the United States has acted or refused to act on grounds generally applicable to the class; and
> > (3) the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available

[2] Under section 2501, "Every claim of which the United States Court of Federal Claims has jurisdiction shall be barred unless the petition thereon is filed within six years after such claim first accrues." 28 U.S.C. § 2501 (2006). "[T]he NITU [or CITU] publication date is the date on which the six-year limitations period of 28 U.S.C. § 2501 begins to run for a taking claim under the Trails Act." Bright v. United States, 603 F.3d 1273, 1276 (Fed. Cir. 2010) (citation omitted); see also Macy Elevator, 97 Fed. Cl. at 712 n.7 ("[I]ssuance of a CITU or a NITU is an alternative to the standard process of approving the railroad's application for abandonment.").

> methods for fairly and efficiently adjudicating the controversy. The matters pertinent to these findings include:
>
> (A) the class members' interests in individually controlling the prosecution of separate actions;
>
> (B) the extent and nature of any litigation concerning the controversy already begun by class members; . . . and
>
> (D) the likely difficulties in managing a class action.

RCFC 23(a), (b).

The requirements of RCFC are grouped into five categories (1) numerosity- meaning joinder is impracticable; (2) commonality- meaning the presence of common questions of law or fact; (3) typicality- meaning that the named parties' claims are typical of the class; (4) adequacy- meaning that the named plaintiffs are capable of fair representation of the class; and (5) superiority- meaning that a class action is the fairest and most efficient way to resolve the controversy. See Barnes v. United States, 68 Fed. Cl. 492, 494 (2005); see generally Wal-Mart Stores, Inc. v. Dukes, 131 S.Ct. 2541 (2011) (as to the federal rule).

"The class action is 'an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only.'" Wal-Mart, 131 S.Ct. at 2550 (quoting Califano v. Yamasaki, 442 U.S. 682, 700-01 (1979)). Thus, the party seeking class certification bears the burden of proving, by a preponderance of the evidence, that each of these requirements is satisfied. See Haggart v. United States, 89 Fed. Cl. 523, 530 (2009); Filosa v. United States, 70 Fed. Cl. 609, 615 (2006). "[F]ailure to satisfy any one [requirement] is fatal to class certification." Barnes v. United States, 68 Fed. Cl. 492, 494 (2005) (citing Gen. Tel. Co. of Sw. v. Falcon, 457 U.S. 147, 161 (1982) (making this observation as to the Federal rule)). A trial judge is required to subject a motion for class

certification to "rigorous analysis" to ensure that the moving party carries its burden with regard to each of the factors. Wal-Mart, 131 S.Ct. at 2551. Therefore, if the plaintiffs fail to meet their burden with regard to any one of the five factors, their motion for class certification must be denied. As the Supreme Court recently explained in Wal-Mart, class certification is not "a mere pleading standard." Id. The plaintiffs must prove each of the elements. See id. at 2551 n.5 (disposing of the case on commonality grounds and therefore declining to consider other Rule 23(a) requirements). "A party seeking class certification must affirmatively demonstrate his compliance with the Rule—that is, he must be prepared to prove that there are in fact sufficiently numerous parties, common questions of law or fact, etc." Id. at 2551; see also Falcon, 457 U.S. at 160 ("[A]ctual, not presumed, conformance with Rule 23(a) remains . . . indispensable").

**III. Plaintiffs Have Failed To Meet Their Burden With Regard To Numerosity**

As noted above, under the RCFC 23 numerosity is satisfied if the class is "so numerous that joinder of all members is impracticable." RCFC 23(a)(1). In deciding whether this factor is met, courts consider various attributes of the putative class including the number, location, the ease of identifying its members, and size of individual claims. See 7A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 1762 (3d ed. 2005); Jaynes v. United States, 69 Fed. Cl. 450, 454 (2006) ("Joinder is considered more practicable when all members of the class are from the same geographic area. The same is true when class members are easily identifiable.") (internal quotation and citation omitted); King v. United States, 84 Fed. Cl. 120, 124-25 (2008) ("The court determines numerosity by a variety of factors that include

the number of class members, the location of the members of the proposed class, the size of the individual claims, and the nature of the action."). This court has recognized that judges have "wide discretion to determine on a case by case basis if the numerosity requirement is met." Favreau v. United States, 48 Fed. Cl. 774, 777 (2000). There is no magic number; the court must examine the specific facts of each case. See Gen. Tel. Co. of Nw., Inc. v. EEOC, 446 U.S. 318, 330 (1980). For example, it is long-recognized that where the costs of litigation would overwhelm putative class members from filing smaller claims, a small class size has been justified. Douglas R. Bigelow Trust v. United States, 97 Fed. Cl. 674, 677, 677 n.6 (2011).

The plaintiffs contend that there are approximately twenty-eight parcels within the High Line rail corridor, which they argue are owned by various entities. Three of the putative class members have filed a separate action with respect to two of the parcels. That action is also before this court as a directly related case. See Am. Compl., 437-51 West 13th Street LLC v. United States, No. 11-374L (Fed. Cl. June 13, 2011), ECF No. 4. According to the plaintiffs, the remaining twenty-six separately platted parcels are "owned by multiple persons in a variety of manners such as limited partnerships, limited liability companies, trusts and corporations." Pls.' Br. in Supp. of Mot. to Certify Class Action at 11, ECF No. 6. They argue that "such a large class of Manhattan property owners is considerable." Id. Relying on cases in this court and other federal district courts where class actions have been certified with twenty-five or fewer class members, the plaintiffs contend that they have satisfied the numerosity factor under RCFC 23. Id.

The government argues that plaintiffs have failed to meet their burden with regard to numerosity. The government states that an exhibit to the Trail Use Agreement, attached to the plaintiffs' complaint, shows that approximately twenty-four separate owners have an interest in the twenty-eight parcels along the High Line rail corridor identified before that agreement was signed (a few months after the CITU was issued). See Compl., Ex. I, at 21-29, ECF No. 1-9. The government notes that three of those property owners filed a separate case that is now before this court as a related case. The government further notes that New York City appears to have been the owner of two of the parcels,[3] while some of the other owners appear to be New York government agencies. Specifically, the Triborough Bridge and Tunnel Authority apparently owned two parcels along the right-of-way,[4] and the Metropolitan Transit Authority[5] and the New York Convention Center Development Corporation[6] apparently each owned one parcel along the right-of-way at the time the CITU was issued. The government contends that these entities would not be expected to join any class. In addition, the government contends that any of the owners that signed the Release and Waivers identified above would not likely join any class action. As such, the government argues any class certified in this case would likely be quite small and thus joinder would not be impracticable.

[3] Block 644 Lot 10 ("75-95 Gansevoort Street, a/k/a 82 Washington Street") and Block 644 Lot 1 ("42-62 Little West 12th Street, a/k/a 555 West Street"). See Compl., Ex. I, at 21.

[4] Block 702 Lot 1 ("South side[] 32nd St. Between 10th and [1]1th Aves.") and Block 676 Lot 3 ("320 12th Avenue"). See id. at 28-29.

[5] Block 702 Lot 50 ("501-57 West 30th St."). See id. at 28.

[6] Block 679 Lot 1 ("651-59 West 33rd Street, a/k/a/ 651 12th Ave."). See id. at 29.

Moreover, the government argues, the fact that three other landowners elected to file a separate action with the same counsel who is representing the plaintiffs in this case indicates that individual claims are of a sufficient size that the cost of litigation would not be a barrier to filing suit. Indeed, the government argues, the subject complaint in this case states that the "value of the property interests taken from Plaintiffs is substantial." Compl. ¶ 42.

The plaintiffs have not offered any evidence to rebut the government's factual assertions regarding the number of potential class members or the value of their claims. For the reasons that follow, the court agrees with the government that the plaintiffs have not met their burden with regard to numerosity.

First, the limited number of class members (fewer than twenty-five) in this putative class is not, without more, sufficient to justify class certification on the grounds that joinder is impracticable. The rail corridor at issue is 1.45 miles long and fee ownership of the corridor appears to be in the hands of business entities and government agencies that have long been involved with various aspects of the High Line project. This is not a case where the numbers are too great to join them in a single action. The plaintiffs have not produced any evidence to show that the number of plaintiffs is likely to exceed twenty-five or that joinder would not be practicable. Second, as the plaintiffs conceded at oral argument, members of the putative class are easily identifiable through a search of New York City's database of land records. Third, in light of the fact that four of the potential class members, who apparently owned six of the parcels at issue, appear

to be New York City or New York government agencies, the court finds it likely that the number of potential class members will diminish even further.

Fourth, the fact that the properties at issue are located in Manhattan and are alleged to be of "substantial" value also distinguishes this case from the rails-to-trails cases the plaintiffs rely upon. As the plaintiffs conceded at oral argument, the value of the property at issue in this case makes this case different from other rails-to-trails cases where the parties do not dispute that each narrow strip of land allegedly taken by the government has a small value relative to the cost of litigation. See Bigelow, 97 Fed. Cl. at 677, 677 n.6 (finding plaintiffs' assertion that the class in question would likely exceed twenty-five or more members met the numerosity requirement where "potential class members own[ed] relatively small parcels of land, such that any potential recovery . . . would like[ly] be exceeded by the litigation costs associated with litigating such matters on an individual basis"); see also Geneva Rock Prods., Inc. v. United States, No. 08-920L, 2011 WL 4099150, at *9 (Fed. Cl. Sept. 15, 2011) ("Courts are more inclined to certify a class with fewer members when 'the costs of litigation threaten to overwhelm the pursuit of smaller claims.'") (quoting Bigelow, 97 Fed. Cl. at 677). In the cases the plaintiffs primarily rely upon, Bigelow, Haggart, Singleton v. United States, 92 Fed. Cl. 78 (2010), and Toscano v. United States, 98 Fed. Cl. 152 (2011), the courts expressed concern that the cost of litigation would overwhelm the pursuit of individual claims outside of a class action. Significantly, with the exception of Bigelow, the number of potential class members in each of the other cases relied upon by the plaintiffs was much greater than the numbers at issue here. See Haggart, 89 Fed. Cl. at 531 (plaintiffs

identified more than 750 potential class members); Singleton, 92 Fed. Cl. at 83 (plaintiffs identified more than 135 potential class members); Toscano, 98 Fed. Cl. at 155 (plaintiffs estimated greater than 800 potential class members). Moreover, there is evidence in this case to show that the cost of litigation is not a barrier to filing suit. The court notes that a separate action was filed on behalf of three landowners who apparently own two of the parcels allegedly "taken" in connection with the High Line trail. The court finds that this companion litigation demonstrates that the cost of litigation over the High Line recreational trail is not so prohibitive as to warrant a finding of numerosity under Rule 23.

Accordingly, the court holds that the plaintiffs have failed to establish by a preponderance of the evidence the numerosity requirement of RCFC 23(a)(1). Failure to comply with even one element of Rule 23(a) is fatal. See Barnes, 68 Fed. Cl. at 494 (citing Falcon, 457 U.S. at 161 (making this observation as to the Federal rule)); see also Wal-Mart, 131 S.Ct. at 2551 ("A party seeking class certification must affirmatively demonstrate his compliance with the Rule—that is, he must be prepared to prove that there are in fact sufficiently numerous parties.").[7] Therefore, the plaintiffs' motion to certify this matter as a class action must fail.

[7] Because the plaintiffs failed to establish the first requirement under RCFC 23(a) the court's inquiry is at an end. Regardless of whether the plaintiffs can establish the other requirements of Rule 23, they must meet the numerosity requirement. Having failed to do so, the court has no reason to evaluate the remaining Rule 23 factors. See Wal-Mart, 131 S.Ct. at 2551 n.5 ("In light of our disposition of the commonality question [of Rule 23(a)(2)] . . . it is unnecessary to resolve whether respondents have satisfied the typicality and adequate-representation requirements of Rule 23(a).").

## IV. Conclusion

For the above stated reasons, the plaintiffs' motion to certify this matter as a class action pursuant to RCFC 23 is **DENIED**.[8]

**IT IS SO ORDERED.**

s/Nancy B. Firestone
NANCY B. FIRESTONE
Judge

[8] The court notes that any future Rails-to-Trails complaints filed in connection with the High Line recreational trail must comply with the notice requirements of RCFC 40.2.