# In the United States Court of Federal Claims

Nos. 11-333L, 11-374L, & 11-713L
(Filed: February 14, 2013)

|  |  |  |
|---|---|---|
| WEST CHELSEA BUILDINGS, LLC, et al., | ) ) ) | **"Rails-to-Trails" case; New York** |
| *and* | ) ) | **law; third-party beneficiary;** **covenant not to sue agreement;** |
| 437-51 WEST 13TH STREET LLC, et al., | ) ) ) | **scope of takings claim under the** **Trails Act; voluntary waiver of Fifth** **Amendment claims; Nollan/Dolan** |
| *and* | ) ) | **takings analysis and voluntary** **agreement** |
| TENTH AVENUE ASSOCIATES, LP, et al., | ) ) ) |  |
| Plaintiffs, | ) ) |  |
| v. | ) ) |  |
| THE UNITED STATES, | ) ) |  |
| Defendant. | ) ) ) |  |

*Mark F. ("Thor") Hearne, II*, Clayton, Missouri, for plaintiffs. *Meghan S. Largent* and *Lindsay S.C. Brinton*, Clayton, MO, and *Debra J. Albin-Riley* and *Joseph L. Cavinato, III*, Los Angeles, CA, of counsel.

*Emily M. Meeker*, United States Department of Justice, Washington, DC, with whom were *Ignacia S. Moreno*, Assistant Attorney General, and *Kristine S. Tardiff*, of counsel.

## OPINION

*Firestone*, **JUDGE.**

Pending before the court is the government's motion for summary judgment

seeking to dismiss some of plaintiffs' claims in these consolidated cases arising from the

creation of the "High Line" recreational trail in New York City, New York ("City").  On

June 13, 2005, the Surface Transportation Board ("STB") issued a Certificate of Interim

Trail Use or Abandonment ("CITU") that applied to a 1.45-mile railroad corridor in the

Borough of Manhattan known as the High Line.  On November 4, 2005, the then-owner

of the rail line, CSX Transportation, Inc. ("CSX"), and the City of New York entered into

a Trail Use Agreement as authorized by the CITU.  This Trail Use Agreement eventually

led to the construction of the High Line elevated recreational trail pursuant to the

"railbanking" provision of the National Trails System Act Amendments of 1983, 16

U.S.C. § 1247(d) (2006) ("Trails Act").

This lawsuit involves eight plaintiffs—West Chelsea Buildings, LLC; 22-23

Corp.; 26-10 Corp.; 437-51 West 13th Street LLC; Romanoff Equities, Inc.; Tenth

Avenue Realty Associates, LP; Somatic Realty, LLC; and Semantic Realty, LLC—

entities that are alleged owners of property adjacent to or underneath the High Line.[1]

Plaintiffs ultimately seek just compensation for property rights that they alleged were

"taken" by defendant the United States ("the government") when it issued the CITU

authorizing use of the High Line as a recreational trail.  Before reaching the merits of

---

[1] Plaintiffs in West Chelsea Buildings, LLC v. United States, No. 11-333, are West Chelsea
Buildings, LLC, 22-23 Corp., and 26-10 Corp.  Plaintiffs in West Chelsea filed a motion for
class certification, which this court denied.  Plaintiffs in 437-51 West 13th Street LLC v. United
States, No. 11-374, are 437-51 West 13th Street LLC and Romanoff Equities, Inc.  Plaintiffs in
Tenth Avenue Associates, LP v. United States, No. 11-731, are Tenth Avenue Realty Associates,
LP, Somatic Realty, LLC, and Semantic Realty, LLC.  An additional party, Liron Realty, Inc.,
was voluntarily dismissed without prejudice on June 22, 2012.  Order, ECF No. 55.

plaintiffs' case, however, the government argues that claims by six of the plaintiffs are jurisdictionally barred and must be dismissed.[2]

Specifically, the government argues that it is the third party beneficiary of certain agreements entered into in connection with the creation of the High Line.  As part of its efforts to preserve the High Line for public use, the City and six plaintiffs—West Chelsea Buildings, LLC; 22-23 Corp.; 26-10 Corp.; 437-51 West 13th Street LLC; Tenth Avenue Associates, LP; and Somatic Realty, LLC (these six plaintiffs are collectively referred to for purposes of the pending motion as "plaintiffs")—entered into agreements with the City in which, the government argues, plaintiffs agreed not to sue the United States for any relief with respect to the High Line CITU, in exchange for certain benefits.  The government contends, based on its alleged status as third party beneficiary, that these six plaintiffs must be dismissed.  For one of the six plaintiffs, 437-51 West 13th Street LLC, the government also argues that that plaintiff did not own property under or adjacent to the High Line on the date of the alleged taking, and therefore lacks standing to bring its Fifth Amendment claim.  For the reasons discussed below, the court **GRANTS** the government's motion for summary judgment.

## I.     BACKGROUND

The following background facts are undisputed unless otherwise noted.  The High Line is a public park built on a former elevated rail corridor in the West Chelsea

---

[2] Should these plaintiffs' claims be barred, only two plaintiffs would remain in these consolidated actions, Semantic Realty, LLC and Romanoff Equities, Inc.

neighborhood of the Borough of Manhattan, New York City.[3]  Since its development as a public park, the High Line has become a popular New York City destination.  This case arises out of the efforts, over several years, to preserve the High Line for public use.

As part of these efforts, the City participated in STB proceedings initiated by the Chelsea Property Owners, a stakeholder group whose members owed property underlying the High Line, and who originally wanted the High Line torn down.  Plaintiffs were members of the Chelsea Property Owners, provided financial support, or participated in meetings and conference calls held by the Chelsea Property Owners in regard to its plan for the High Line.  Def.'s Mot., Ex. C, Deposition of Jeffrey Toback[4] ("Toback Dep.") 10-13; Id., Ex. D, Deposition of Gary Spindler[5] ("Spindler Dep.") 23-26; Id., Ex. F, Deposition of Michael Romanoff[6] ("Romanoff Dep.") 19-22.

The High Line was not torn down; instead, after several years of negotiations, the City and the Chelsea Property Owners struck a deal to preserve the High Line as a public space.  Plaintiffs, as part of that deal, signed the Release, Waiver, and Covenant Not to Sue Agreements ("Covenant Not to Sue Agreements" or "Agreements") at issue in this

---

[3] The former railway right-of-way at issue in this case is approximately 1.45 miles long and extends from 93 Gansevoort Street and runs northerly and westerly through 547-55 West 34th Street and the West 34th Street streetbed.  Def.'s Mot., Ex. A, Declaration of Joseph T. Gunn ("Gunn Decl.") ¶ 4.

[4] Jeffrey Toback has served as general counsel to plaintiff West Chelsea Buildings, LLC since 1994.  Toback Dep. 9.

[5] Gary Spindler signed the agreements at issue in this case for plaintiffs 22-23 Corp. and 26-10 Corp. as the President of those entities.  Gunn Decl., Exs. C, D.

[6] Michael Romanoff signed the agreements at issue in this case as Manager of plaintiff 437-51 West 13th Street LLC.  Gunn Decl., Ex. F.

case.  The court now discusses in detail the original plan to tear down the High Line, the

negotiations and eventual agreements between the High Line stakeholders, the Covenant

Not to Sue Agreements, and the special zoning district created as a result of the

overarching agreement between plaintiffs, the City, and the railroad.

### A.      The original plan to tear down the High Line.

The Chelsea Property Owners began its efforts to tear down the High Line in the

early 1990s, when it filed a third-party (or adverse)[7] application with the Interstate

Commerce Commission ("ICC") (predecessor of the STB), requesting that the ICC

authorize abandonment of the High Line pursuant to 49 U.S.C. § 10903 (2006).  The ICC

granted the Chelsea Property Owners' application, but required as a condition of its

approval that the Chelsea Property Owners post a bond or surety to ensure payment of

any demolition expenses exceeding $7 million.  The Chelsea Property Owners struggled

to post the bond for several years, and in 1999 filed a motion asking the STB to issue a

certificate of abandonment for the rail line.  See W. Chelsea Buildings, LLC v. United

States, No. 11-333, Compl., Ex. E (the STB decision on the Chelsea Property Owner's

1999 motion).  The STB concluded that the Chelsea Property Owners' proposal did not

meet the requirements of the 1992 decision and denied the motion.  Id.

_____

[7] In typical abandonment cases before the ICC, a railroad requests the ICC to allow it to
discontinue service of a particular line.  In an adverse abandonment, the railroad wants to
continue service and a third party seeks an issuance of an abandonment certificate.  A third party
generally seeks abandonment because it wants the rail line condemned, and an abandonment
certificate can be used to establish that the line is not required for rail service and therefore is not
exempt from local or state condemnation.  See Consol. Rail Corp. v. I.C.C., 29 F.3d 706, 708-09
(D.C. Cir. 1994) (an opinion arising out of the litigation surrounding the portion of the High Line
at issue in this case).

Three years later in August 2002, the Chelsea Property Owners filed another motion for a certificate of abandonment of the High Line with the STB.  See id., Ex. H. The City initially supported the efforts to tear down the High Line.  Id. at 2.  However, the City reconsidered that policy after Michael Bloomberg became Mayor in 2002.  See Def.'s Mot., Ex. A, Declaration of Joseph T. Gunn[8] ("Gunn Decl.") ¶ 9.  Around that time, the City was studying the potential rezoning of the West Chelsea neighborhood, which was then zoned for manufacturing and "largely characterized by underutilized properties such as parking lots, with increasing numbers of art galleries and museums in midblock locations."  Id.  City planners and administrative staff "concluded the public use of the High Line might well serve as a potential catalyst for neighborhood revitalization of West Chelsea" and began to consider whether the STB might issue a CITU under the Trails Act, which would allow the rail corridor to be used as a public recreational trail.  Id.

In December 2002, the City decided to support the efforts of the Friends of the High Line, Inc. ("Friends of the High Line"), a community based non-profit group formed "to save the historic structure from demolition."  Def.'s Mot., Ex. B, Declaration of Robert Hammond[9] ("Hammond Decl.") ¶ 7.  Friends of the High Line participated in

---

[8] Joseph T. Gunn is Senior Counsel in the New York City Law Department.  Gunn Decl. ¶ 1.  He provides legal services to the City primarily on transactional and contract matters, and represented the City in its negotiations with the property owners who owned property encumbered by the High Line, including plaintiffs.  Id. ¶¶ 3, 5.

[9]  Robert Hammond is the co-founder and Executive Director of Friends of the High Line, Inc. Hammond Decl. ¶ 1.

the STB proceedings concerning the High Line.  Id. ¶ 9.  When the Chelsea Property

Owners filed its motion for a certificate of abandonment in 2002, Friends of the High

Line opposed it and asked the STB to reconsider its 1992 decision granting an application

for adverse abandonment of the High Line.  Id. ¶ 10.  Friends of the High Line spoke in

favor of preserving the High Line for public use.  Id. ¶ 12.

> **B.** **The negotiations and agreement between the property owners and the City to preserve the High Line for public use.**

Following the City's support for preserving the High Line, the Chelsea Property

Owners entered into negotiations with CSX and the City in 2002 to discuss developing

the High Line as a public space.  Five of the six plaintiffs that eventually signed the

Covenant Not to Sue Agreements were involved in these negotiations.[10]  The Chelsea

Property Owners were represented by counsel, and each of the five plaintiffs consulted

with their own counsel as part of the negotiations with the City.  See Toback Dep. 41

(West Chelsea Buildings, LLC); Def.'s Mot., Ex. E, Deposition of Barry Haskell[11]

---

[10] The sixth plaintiff, 437-51 West 13th Street LLC, signed the Covenant Not to Sue Agreement four years after the other plaintiffs had delivered their Agreements.  This plaintiff owned property that was south of the boundary of the special rezoning district that was eventually created as part of the deal between the City and the Chelsea Property Owners.  Because the court dismisses this plaintiff on standing grounds, see infra Part II.A, the court will not discuss in detail the facts surrounding 437-51 West 13th Street LLC's signing of the Covenant Not to Sue Agreement.

[11] Barry Haskell is the property manager for plaintiff Somatic Realty, LLC.  Haskell Dep. 10. Mr. Mendy Taffel, a management member of plaintiffs Somatic Realty, LLC and Semantic Realty, LLC, was also a shareholder and officer of Tenth Avenue Realty Associates, LP, and signed the agreements at issue in this case on behalf of Somatic Realty, LLC and Tenth Avenue Realty Associates, LP.  Gunn Decl., Exs. G, H; Haskell Dep. 31.

("Haskell Dep.") 30 (Somatic Realty, LLC and Tenth Avenue Realty Associates, LP); Spindler Dep. 29, 31, 43 (22-23 Corp. and 26-10 Corp.).

The Chelsea Property Owners eventually struck a deal with the City and CSX, consisting of several elements.  Gunn Decl. ¶¶ 10-11, 20.  The City would approve a Special West Chelsea District ("Special District") rezoning, which, as described in more detail below, introduced a system that allows the transfer of development rights from underneath and adjacent to the High Line to other areas of the Special District.  Id. ¶ 20. The City would also provide Internal Revenue Service forms to the Chelsea Property Owners' members to assist them in taking a charitable tax deduction for their donation of a public use easement to supplement the existing easement owned by CSX.  Id.  For their part, the Chelsea Property Owners' members, including plaintiffs, would withdraw their objections to the CITU and donate supplemental easements to the City.  Id.  Also as part of the deal, plaintiffs were to execute the Covenant Not to Sue Agreements.[12]  Id. ¶ 21.

The overall timeline for the deal proceeded as follows.  Sometime in 2004, a draft Term Sheet, outlining the above-described aspects of the deal between the High Line stakeholders, was circulated to the property owners represented by the Chelsea Property

---

[12] As part of the deal, the five plaintiffs also signed covenant not to sue agreements with CSX, quitclaim, consent, and easement agreements with the City for the donation of supplemental easements, and authorizations which stated that the signatory had "taken all action required to authorize the execution and delivery" of all of these documents.  See Toback Dep. 65, Ex. 8 (West Chelsea Buildings, LLC); Spindler Dep. 38-39, 79-80, Ex. 5 (22-23 Corp.), Ex. 14 (26-10 Corp.); Haskell Dep. 44-46, Ex. 7 (Somatic Realty, LLC), Ex. 8 (Tenth Avenue Realty Associates, LP).

At least two of the plaintiffs also signed release, waiver and covenant not to sue agreements with the Chelsea Property Owners.  See Haskell Dep. 80-81, 84, Ex. 16 (Somatic Realty), Ex. 17 (Tenth Avenue Realty Associates).

Owners.  Def.'s Mot, Ex. G, Declaration of Emily M. Meeker ("Meeker Decl."), Ex. 1

(High Line Term Sheet); see also Toback Dep., Ex. 4 (a November 22, 2004 summary of

the "major aspects of the proposed Special West Chelsea District rezoning and

conversion of the Highline to public space").  The term sheet included a draft of the

Covenant Not to Sue Agreements as well as several other agreements eventually made in

connection with the deal between the High Line stakeholders.  Gunn Decl. ¶¶ 13-15; see

supra note 12.  Several drafts were circulated between the City and Chelsea Property

Owners before these agreements were finalized.  Gunn Decl. ¶ 15.

The Chelsea Property Owners formally withdrew their opposition to the issuance

of a CITU in December 2004.  Id. ¶ 16.  The STB granted the City's request for the

issuance of a CITU on June 13, 2005.  Id. ¶ 17.  Ten days later, on June 23, 2005, the

New York City Council approved the rezoning of the Special District.  Id. ¶ 18.

After the issuance of the CITU, between June 14, 2005 and October 11, 2005,

plaintiffs West Chelsea Buildings, LLC, 22-23 Corp., 26-10 Corp., Tenth Avenue Realty

Associates, LP, and Somatic Realty, LLC signed the final versions of the Covenant Not

to Sue Agreements at issue in this case.  Id., Exs. B, C, D, G, H.  On November 4, 2005,

the closing of the conveyance of the High Line from CSX to the City occurred and a Trail

Use Agreement was signed between the City and CSX.  Id. ¶ 19.  At this closing, the

Chelsea Property Owners delivered the Covenant Not to Sue Agreements signed by five

of the plaintiffs that are the subject of the pending motions.  Id. ¶ 23.

## C.     The Covenant Not to Sue Agreements.

As discussed briefly above, after the STB granted the City's request for the issuance of a CITU on June 13, 2005, five of the plaintiffs signed the Covenant Not to Sue Agreements with the City.  Gunn Decl., Ex. B, Release, Waiver and Covenant Not to Sue Agreement (West Chelsea Buildings, LLC, dated June 14, 2005); Gunn Decl., Ex. C, Release, Waiver and Covenant Not to Sue Agreement (22-23 Corp., dated October 11, 2005); Gunn Decl., Ex. D, Release, Waiver and Covenant Not to Sue Agreement (26-10 Corp., dated October 11, 2005); Gunn Decl., Ex. G, Release, Waiver and Covenant Not to Sue Agreement (Tenth Avenue Realty Associates, LP, dated August 31, 2005); Gunn Decl., Ex. H, Release, Waiver and Covenant Not to Sue Agreement (Somatic Realty, LLC, dated August 31, 2005).  All of the Agreements contained a prologue listing several purposes of the Agreements, including the following:

> WHEREAS, [plaintiff], desiring to encourage, induce and cooperate with said initiatives [conversion of the High Line to public space and the creation of the Special District], has agreed to grant certain releases, waivers and covenants to the City in furtherance thereof.

See, e.g., Gunn Decl., Ex. B at 2.  The Agreements also state:

> This Agreement shall be binding upon and inure to the benefit of the City and [plaintiff], and their respective heirs, personal representatives, successors and assigns.

Id., Ex. B ¶ 12.

The parties' dispute centers the following provision of the Covenant Not to Sue Agreements:

> 1.  Release and Waiver.  (A)  Subject to the provisions of subparagraph (B) of this paragraph 1, Owner [plaintiffs], for itself and its successors, heirs,

administrators and assigns as owner of the Servient Property, for good and valuable consideration, the receipt and adequacy whereof is hereby acknowledged, hereby:

…

> (b)    agrees not to sue or join any action seeking compensation from, and will not participate with and will withdraw from any class action seeking compensation from the City or The United States of America or any of its departments or agencies with respect to the Highline CITU . . .

See, e.g., Toback Dep. 36-37, Ex. 5 ¶ 1(A)(b) (emphasis added) ("Covenant Not to Sue Agreement ¶ 1(A)(b)").

According to Joseph Gunn, Senior Counsel in the New York City Law Department involved in the High Line negotiations, it was the City's intent in the Covenant Not to Sue Agreements "to preclude any claim against the City by the property owners in connection with the issuance of the CITU, and to generally settle all matters in connection with the CITU." Gunn Decl. ¶ 21. Mr. Gunn states that at the time of negotiations, "[t]he City was aware of the potential for litigation against the United States" and "[i]n keeping with the City's desire to settle all matters related to the CITU, the owners of the properties north of 16th Street agreed not to sue the United States of America for compensation in connection with the CITU."[13] Id.

The Covenant Not to Sue Agreements included other releases between the City and plaintiffs, such as for claims against the City regarding contamination or the demolition of the High Line. See, e.g., Gunn Decl., Ex. B ¶ 1(A)(a). The Agreements

---

[13] Plaintiffs dispute that the City intended to benefit the United States in the Agreements, but provide no evidence that offers a different motive for including the covenant not to sue clause on the part of either party.

also outlined claims that plaintiffs and the City agreed were not waived, including claims

arising after the City should, if ever, restore rail service on the High Line.  Id. ¶ 1(B).

Plaintiffs also agreed that if they themselves pursued reactivation of the rail line, they

would reimburse the City for any improvements made on the High Line and pay the

amounts of any condemnation awards necessary to maintain the use of public space of

any parts of the High Line that were not restored for rail service.  Id. ¶ 2(A).  For its part,

the City covenanted that, if rail service was ever reactivated, it would pay plaintiffs the

diminution in value of their property as a result.  Id. ¶ 2(B) ("The City hereby covenants

that if the City . . . shall ever seek to obtain restoration of passenger or other rail service

on or over the Highline . . ., the City shall pay Owner the amount by which the value of

the Servient Property is diminished as a result thereof.").  The City also indemnified

plaintiffs in connection with the City's development and maintenance of the High Line.

Id. ¶ 3.

   Plaintiffs signed the Covenant Not to Sue Agreements with the City on the same

date that they signed: (1) release, waiver and covenant not to sue agreements with CSX,

and (2) quitclaim, consent and easements with the City.[14]  Plaintiffs also signed

---

[14] See Toback Dep., Ex. 6 (West Chelsea Buildings, LLC Release to CSX), Ex. 7 (West Chelsea Buildings, LLC Quitclaim); Spindler Dep., Ex. 7 (22-23 Corp. Release to CSX), Ex. 8 (22-23 Corp. Quitclaim), Ex. 16 (26-10 Corp. Release to CSX), Ex. 17 (26-10 Corp. Quitclaim); Haskell Dep., Ex. 11 (Somatic, LLC Quitclaim), Ex. 13 (Tenth Avenue Realty Associates, LP Quitclaim), Ex. 14 (Somatic, LLC Release to CSX), Ex. 15 (Tenth Avenue Realty Associates, LP Release to CSX).  In the quitclaim, consent and easement, plaintiffs supplemented the existing High Line rail corridor easement by conveying to the City "an exclusive, perpetual right-of-way, servitude and easement" for use of the High Line for public space.  See Toback Dep., Ex. 7 at 2.

authorizations, which stated that each signatory to the various agreements had "taken all action required to authorize the execution and delivery" of these documents.[15]

After plaintiffs signed all of these agreements, the City and CSX signed a Trail Use Agreement for the High Line on November 4, 2005, and the High Line was transferred from CSX to the City.  See W. Chelsea Buildings, No. 11-333, Compl., Ex. I. The documents signed by plaintiffs, including the Covenant Not to Sue Agreements, were delivered to the City as part of the closing of the deal.  Once all of the agreements were signed and the deal was closed, the High Line was officially established as a trail within the STB's Rails-to-Trails system.  There is no dispute that no representative of the United States either participated in the negotiations that led to the creation of the trail or was a part of the Covenant Not to Sue Agreements, or any other agreements which were necessary to create the High Line recreational trail.  However, it is also undisputed that the STB was aware of the negotiations between the High Line stakeholders through filings it received regarding the High Line CITU.

### D.      The Special West Chelsea District.

As part of the deal struck by the stakeholders, the Special West Chelsea District was approved by the New York City Council on June 23, 2005, three years after the parties began negotiations to preserve the High Line for public use.  This rezoning affected an area on the west side of Manhattan that surrounds the High Line, approximately between West 16th Street on the south, West 30th Street on the north,

---

[15] See Toback Dep., Ex. 8 (West Chelsea Buildings, LLC); Spindler Dep., Ex. 5 (22-23 Corp.), Ex. 14 (26-10 Corp.); Haskell Dep., Ex. 7 (Somatic Realty, LLC), Ex. 8 (Tenth Avenue Realty Associates, LP).

Tenth Avenue on the east, and Eleventh Avenue on the west.  See Meeker Decl., Ex. 2,

West Chelsea Zoning Amendment App. A.; see also N.Y.C. Zoning Res. art. IX, ch. 8,

App. B.  The West Chelsea Zoning Amendment ("Zoning Amendment") created a

Special West Chelsea District and rezoned much of the land within this district from a

manufacturing designation to a commercial designation, allowing residential

development in addition to commercial and light industrial uses.  See Gunn Decl. ¶ 20

(stating that the rezoning included "changes in permitted uses . . . from light

manufacturing to commercial and residential").

       The rezoning also introduced a system that allows for the transfer of development

rights from underneath and adjacent to the High Line to other areas of the Special

District.  See Meeker Decl., Ex. 2, West Chelsea Zoning Amendment § 98-04.  The

transfer system allows property owners within an area called the High Line Transfer

Corridor, such as plaintiffs, to sell their development rights to owners of land elsewhere

in the Special District.  See id.  Owners in the High Line Transfer Corridor can sell

unused development rights for use by other parcels within the Special District as long as

those parcels can accommodate the additional development within the caps established

by the City's Zoning Resolution.[16]

---

[16] Apart from the West Chelsea Zoning Amendment, owners of land throughout the City may
only transfer development rights to immediately adjacent parcels by agreement with the adjacent
landowner.  N.Y.C. Zoning Res. art. I, ch. 2, § 12-10 (defining "floor area ratio" and "zoning
lot").  In areas of the City other than low-density commercial zones and low to medium-density
residential zones, landowners may also transfer development rights from landmarked properties
to properties across the street or on an opposite corner from the lot in question.  Id. art. VII, ch. 4,
§ 74-79. Without the creation of the Special West Chelsea District, the transfer of development
rights would be limited to these mechanisms.

To make the High Line transfer mechanism effective, the Zoning Amendment increased the development potential of many sites throughout the Special District by raising the floor area ratio,[17] thereby allowing these sites to accept development rights transferred from the High Line Transfer Corridor properties.  See Meeker Decl., Ex. 2, West Chelsea Zoning Amendment § 98-22.  The Zoning Amendment was "crafted so that there would be more capacity for incorporation of development rights into buildings within the West Chelsea Special District on 10th and 11th Avenues than could be met by the transfer of development rights from High Line properties, so as to ensure a robust market for transfer development rights deriving from the properties encumbered by the High Line."  Gunn Decl. ¶ 20.  The rezoning also allowed additional permissible uses, particularly residential uses, within the West Chelsea Special District.  Together, the increase in floor area ratio for some sites and the increase in allowable uses created a market for transferring development rights from the High Line Transfer Corridor properties to other areas in the Special District.[18]  See Meeker Decl., Ex. 2, West Chelsea Zoning Amendment § 98-00.

---

[17] A floor area ratio limits the development potential on any site by limiting the ratio of developable floor area to the size of the underlying parcel.  See N.Y.C. Zoning Res., art. I, ch. 2, § 12-10 (defining "floor area ratio").

[18] In addition to this general scheme, the Zoning Amendment created several other mechanisms to facilitate the transfer system.  First, owners of certain property can obtain additional floor area ratio by funding improvements to the High Line through the High Line Improvement Bonus Program.  See Meeker Decl., Ex. 2, West Chelsea Zoning Amendment § 98-25.  Second, owners of vacant lots who sold all of their development potential for use on other parcels can purchase additional development rights up to an floor area ratio of 1.0 from the City of New York in order to develop commercial space (through the High Line Transfer Corridor Bonus program).  See id. § 98-35.  Finally, after development rights are transferred, owners of some parcels can garner additional floor area ratio by providing low- and moderate-income housing.  See id. § 98-26. The

Several of the plaintiffs have taken advantage of the development rights transfer system and have sold some of their development rights for millions of dollars.  See Toback Dep. 82-84, Exs. 12, 14; Spindler Dep. 67, 69, 70, 109, Exs. 10-11, 20-21.  The High Line Term Sheet developed during the negotiations between the City, CSX, and the Chelsea Property Owners required High Line property owners seeking to transfer development rights to certify that no condemnation award had been received in connection with the use of the High Line for public space.  Meeker Decl., Ex. 1 at 18. The City also required property owners who transferred their development rights to agree not to sue the United States for a condemnation award in connection with the High Line. The plaintiffs who took advantage of the transfer development system made these declarations.  See Toback Dep. 75, Ex. 10 ¶ 10, Restrictive Declaration: High Line Transfer of Development Rights by West Chelsea Buildings, LLC ("Declarant hereby forever and irrevocably releases and waives and covenants not to seek any condemnation or similar award in connection with the use of the High Line for Public Space from . . . the United States of America."); Spindler Dep. 64, 67, 98-99, Ex. 9 ¶ 9, Restrictive Declaration: High Line Transfer of Development Rights by 22-23 Corp. (same); Ex. 19 ¶ 9, Restrictive Declaration: High Line Transfer of Development Rights by 26-10 Corp. (same).

---

rezoning also introduced design controls that guide growth in various areas of the Special District, including managing development adjacent to the High Line in order to maintain the quality of the public space on the High Line.  See id. §§ 98-40 through 98-55.

### E.      Plaintiffs' suit before this court.

Nearly six years after the Special West Chelsea District was created and the High Line was established as a recreational trail, plaintiffs brought suit in this court, alleging that the STB's issuance of the High Line CITU in June 2005 had taken their property without compensation in violation of the Fifth Amendment, in three separate, and now consolidated, cases.  W. Chelsea Buildings, No. 11-333 (Fed. Cl. filed May 24, 2011); 437-51 W. 13th Street LLC v. United States, No. 11-374 (Fed. Cl. filed June 10, 2011); Tenth Avenue Realty Assocs., LP v. United States, No. 11-713 (Fed. Cl. filed Oct. 27, 2011).  Plaintiffs seek an award of the full fair market value of the property allegedly taken by the United States, including any severance damages, as well as interest, and costs and attorneys' fees.

On October 11, 2011, the court denied the plaintiffs' request in West Chelsea Buildings, No. 11-333, to certify their suit as a class action.  Order, Oct. 11, 2011, ECF No. 22.  The parties agreed that the court should address the effect of the Covenant Not to Sue Agreements and any other jurisdictional issues before proceeding to the merits of plaintiffs' takings claims.  The government filed its motion for summary judgment as to the effect of the Covenant Not to Sue Agreements signed by six of the plaintiffs, as well as the standing of one of those six plaintiffs, on June 14, 2012.  Oral argument on this motion was held on December 19, 2012.  After oral argument and at the request of plaintiffs, the parties provided supplemental briefing, which was completed on January 18, 2013.

17

## II.   STANDARD OF REVIEW

When considering a summary judgment motion, the court's proper role is not to "weigh the evidence and determine the truth of the matter," but rather "to determine whether there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact." United States Court of Federal Claims Rule 56(a); see also Consolidation Coal Co. v. United States, 615 F.3d 1378, 1380 (Fed. Cir. 2010). A material fact is one that "might affect the outcome of the suit," and a dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248. In reviewing the facts, "all justifiable inferences are to be drawn" in favor of the party opposing summary judgment. Id. at 255.

Once the movant has shown that no genuine issue of material fact exists, the party opposing summary judgment must demonstrate that such an issue does, in fact, exist. Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). To establish a genuine issue of material fact, a party "must point to an evidentiary conflict created on the record; mere denials or conclusory statements are insufficient." Radar Inds., Inc. v. Cleveland Die & Mfg. Co., 424 F. App'x 931, 936 (Fed. Cir. 2011) (quoting SRI Int'l v. Matsushita Elec. Corp. of Am., 775 F.2d 1107, 1116 (Fed. Cir. 1985)) (internal quotation omitted). Where there is doubt as to the existence of a genuine issue of material fact, that doubt must be resolved in favor of the nonmovant. Unigene Labs., Inc. v. Apotex, Inc., 655 F.3d 1352, 1360 (Fed. Cir. 2011) (citing Ortho-McNeil Pharm., Inc. v. Mylan Labs., Inc., 520 F.3d 1358, 1360-61 (Fed. Cir. 2008)).

Summary judgment is also appropriate where the only issues to be decided are issues of law.  Huskey v. Trujillo, 302 F.3d 1307, 1310 (Fed. Cir. 2002) (citing Dana Corp. v. United States, 174 F.3d 1344, 1347 (Fed. Cir. 1999)); 10A Charles Alan Wright et al., Federal Practice & Procedure § 2725 (3d ed. 2012) ("It necessarily follows from the standard set forth in the rule that when the only issues to be decided in the case are issues of law, summary judgment may be granted.").

## III.   DISCUSSION

The parties' dispute in this case centers on whether the United States is a third party beneficiary of the Covenant Not to Sue Agreements, and if so, if the provision waiving plaintiffs' claims against the United States waives all of those claims, or is otherwise enforceable.  If the government can establish that it is a third party beneficiary, and that the waiver found in the Covenant Not to Sue Agreements validly bars all claims against the government in connection with the establishment of the High Line recreational trail, then the Covenant Not to Sue Agreements bar the claims of six plaintiffs in this case, and their claims must be dismissed.

The government argues that, under New York law, the United States is a third party beneficiary to the Covenant Not to Sue Agreements, and that the plain language of the Agreements bars these plaintiffs from bringing suit against the United States in this case.  The government asserts that it has established its third party beneficiary status under New York law because:  (1) the Agreements are valid and binding in that there was offer, acceptance, and consideration for Agreements and the overall deal with the City; (2) the language of the Agreements explicitly reference the United States and the benefit

bestowed on the United States, and this plain and unambiguous language shows an intent to provide a direct and immediate benefit to the United States; and (3) although it is unnecessary for the court to look beyond the plain language of the Agreements, the surrounding circumstances support that the parties intended to benefit the United States.

Plaintiffs argue in response that, read as a whole, the Agreements demonstrate that the United States was not a third party beneficiary, and that, even if it was, the Agreements did not bar all claims against the United States in connection with the CITU. Plaintiffs further argue that the covenant not to sue the United States found in the Agreements is unconstitutional.

The court now turns to the parties' arguments. For the reasons that follow, the court finds that the United States may assert its status a third party beneficiary to the Covenant Not to Sue Agreements in this case, that the waiver in those Agreements bars plaintiffs' claims, and that the waiver is not unconstitutional.

### A. Plaintiff 437-51 West 13th Street LLC lacks standing to pursue its takings claim.

Before proceeding to the central dispute in this case—whether the Covenant Not to Sue Agreements bestow third party beneficiary status on the United States so as to bar plaintiffs' claims—the court first addresses plaintiff 437-51 West 13th Street LLC's standing in this case. The government argues that plaintiff 437-51 West 13th Street LLC lacks standing to pursue its takings claim because it did not own its property at the time of the alleged taking. Here, the alleged taking occurred when the June 13, 2005 CITU was issued. Ladd v. United States, 630 F.3d 1015, 1023 (Fed. Cir. 2010) (holding that

the issuance of a NITU or CITU triggers a takings cause of action).  However, 437-51 West 13th Street alleges that it acquired its property interest in the land at issue via an indenture on August 25, 2005.  <u>437-51 W. 13th Street LLC</u>, No. 11-374, Am. Compl. ¶ 48.

Plaintiffs do not respond to this argument in their briefs.  Only plaintiffs with "a valid property interest at the time of the taking are entitled to compensation." <u>CRV Enters., Inc. v. United States</u>, 626 F.3d 1241, 1249 (Fed. Cir. 2010) (citations omitted). Because it did not own the property at issue at the time of the taking, 437-51 West 13th Street LLC's claim must be **DISMISSED** for lack of jurisdiction.  In the discussion below, the court therefore addresses the claims of the five remaining plaintiffs in connection with the Covenant Not to Sue Agreements—West Chelsea Buildings, LLC; 22-23 Corp.; 26-10 Corp.; Tenth Avenue Realty Associates, LP; and Somatic Realty, LLC.

### B.   The United States may assert its status as a third party beneficiary to the Covenant Not to Sue Agreements.

#### 1.   Legal standards.

It is well-settled that the United States may be a third party beneficiary to an agreement between two other parties.  <u>See, e.g.</u>, <u>United States v. State Farm Mut. Auto. Ins. Co.</u>, 936 F.2d 206, 207 (5th Cir. 1991) (holding that the United States can be a third party beneficiary of an insurance policy).  When the United States asserts its rights as a third party beneficiary to a private agreement, the United States has the burden of showing that it is entitled to those rights under the state law governing that agreement.

See id. at 209; Interspiro USA, Inc. v. Figgie Int'l Inc., 18 F.3d 927, 931 (Fed. Cir. 1994)

(stating that in general, "[i]nterpretation of an agreement presents a question of law,

governed by state contract law") (citations omitted).   In this case, each Covenant Not to

Sue Agreement had a provision stating that "[t]his Agreement shall be governed and

construed in accordance with the internal laws of the State of New York," see, e.g.,

Toback Dep., Ex. 5 ¶ 8, and the parties do not dispute that the law of New York governs

the Agreements.   The court will therefore apply New York law in determining whether

the government has met its burden of demonstrating third party beneficiary status.

     Under New York law, a party seeking to enforce a contract as a third party

beneficiary must establish (1) the existence of a valid and binding contract between other

parties; (2) that the contract was intended for its benefit; and (3) that the benefit to it is

sufficiently immediate, rather than incidental, to indicate the assumption by the

contracting parties of a duty to compensate it if the benefit is lost.   Cal. Pub. Emps. Ret.

Sys. v. Shearman & Sterling, 741 N.E.2d 101, 104 (N.Y. 2000) (quotation omitted).

     To establish the existence of a valid and binding contract, a party must show offer,

acceptance, consideration, mutual assent, and intent to be bound.   See, e.g., Kowalchuk v.

Stroup, 873 N.Y.S.2d 43, 46 (N.Y. App. Div. 2009).   This case involves a unique type of

contract—a covenant not to sue agreement.   A covenant not to sue applies to future as

well as present claims and constitutes an agreement to exercise forbearance from

asserting any claim which either exists or may accrue.   McMahon & Co. v. Bass, 673

N.Y.S.2d 19, 21 (N.Y. App. Div. 1998).   Covenant not to sue agreements are valid and

enforceable contracts in New York.[19]  See, e.g., Hugar v. Damon & Morey LLP, 856

N.Y.S.2d 434, 435 (N.Y. App. Div. 2008) (affirming dismissal of a claim because it was

barred by a covenant not to sue).  The parties do not dispute that the Covenant Not to Sue

Agreements in this case are valid and binding contracts.

Rather, the parties dispute whether the United States is a third party beneficiary of

the covenant not to sue clause at issue in the Agreements, and therefore whether the

United States may use the covenant not to sue clause defensively to bar plaintiffs' claims.

Under New York law, a party may assert third party beneficiary status if it is an

"intended beneficiary" of the contract at issue.  Fourth Ocean Putman Corp. v. Interstate

Wrecking Co., 485 N.E.2d 208, 211-13 (N.Y. 1985).  To determine whether the parties to

a contract intended to bestow an immediate benefit on the third party, and therefore

whether the third party was an "intended beneficiary" of a subject contract, New York

courts follow section 302 of the Restatement (Second) of Contracts.  Id. at 212-13.[20]

---

[19] In addition, some New York courts have stated that covenant not to sue clauses should be construed narrowly against the party relying on them and require clear and explicit language indicating that the parties intended claims to be released.  Kaufman v. Am. Youth Hostels, Inc., 177 N.Y.S.2d 587, 593 (N.Y. App. Div. 1958) (holding that covenant not to sue clauses are "not looked upon with favor by the courts, are strictly construed against the party relying on them, and clear and explicit language in the agreements is required").

[20] Contrary to plaintiffs' assertion, the courts of New York do not require that the language of a contract evidence an intent to permit enforcement by the third party, because the Restatement does not require such a showing.  Plaintiffs quote Fourth Ocean for this proposition; however, that court was referring to prior decisions and factors that New York courts have looked to in determining whether a party is a third party beneficiary, not discussing the Restatement's test. Section 302 of the Restatement does not require evidence of enforcement rights.  Instead, section 304 of the Restatement directs that when "[a] promise in a contract creates a duty in the promisor to any intended beneficiary to perform the promise, . . . the intended beneficiary may enforce the duty."  Restatement (Second) of Contracts § 304.

Under section 302, "a beneficiary of a promise is an intended beneficiary if recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties" and either "the performance of the promise will satisfy an obligation of the promisee to pay money to the beneficiary" or "the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance." Restatement (Second) Contracts § 302(1).  The Restatement further states that "if the beneficiary would be reasonable in relying on the promise as manifesting an intention to confer a right on him, he is an intended beneficiary."  Id. cmt. d.  A beneficiary of a contract that is not an intended beneficiary is an "incidental beneficiary."  Id. § 302(2).

The court must now determine whether the United States is an "intended beneficiary" or merely an "incidental beneficiary" of the Covenant Not to Sue Agreements.  Because there is no promise to pay money to the United States in the Agreements at issue, the court must determine whether "recognition of a right to performance in the [United States] is appropriate to effectuate the intention of the parties" and whether "the circumstances indicate that [the City] intend[ed] to give the [United States] the benefit of the promised performance"— plaintiffs' promise not to sue the United States.  In determining whether a third party is an intended beneficiary under New York law, the intent of the parties is "critical" and the "best evidence of the contracting parties' intent is the language of the agreement itself."  Edge Mgmt. Consulting, Inc. v. Blank, 807 N.Y.S.2d 353, 358 (N.Y. App. Div. 2006).  Courts applying New York law may also look to the surrounding circumstances in order to determine the intent of the parties.  Trans-Orient Marine Corp. v. Star Trading & Marine, Inc., 925 F.2d 566, 573

24

(2d Cir. 1991) ("In determining third party beneficiary status it is permissible for the court to look at the surrounding circumstances as well as the agreement." (citations omitted)); Fourth Ocean, 485 N.E.2d at 212.

### 2. The government's arguments.

Applying these standards, the government argues that it is clear on the face of the Covenant Not to Sue Agreements that the United States is a third party beneficiary in this case, and that there is no other reasonable interpretation of the Agreements. The government asserts that under New York law, an explicit reference in a contract to a benefit conveyed to a third party creates an intent to benefit that third party. Edge Mgmt., 807 N.Y.S.2d at 358-59 (holding that the "explicit wording" of an indemnity provision in the agreement at issue created third party beneficiary status in a group of persons specifically named in the agreement).[21]  In addition, the government asserts, when the language of a contract "admits of no other interpretation" than that the third party "is the direct and only beneficiary" of the promise to benefit that party, the party is a third party beneficiary under New York law. Rekis v. Lake Minnewaska Mountain Houses, Inc., 573 N.Y.S.2d 331, 334 (N.Y. App. Div. 1991).[22]  Here, the government

---

[21] In Edge Management, a lessee sued its lessor after leaking water from the condominium above it—a result of renovations in that unit—led to mold growth. The lessor sought indemnification from the upstairs owner, arguing that it was a third party beneficiary of an alteration agreement between that owner and the condominium's board of managers, in which the upstairs owner indemnified other unit owners against any and all losses that resulted from the renovations. The court held that the lessor was an intended beneficiary because the "explicit wording of the agreement evidences an intent to indemnify other unit owners . . . against any and all loss that results from the renovations." 807 N.Y.S.2d at 358-59.

[22] In Rekis, 573 N.Y.S.2d at 334, the plaintiff, a longtime employee of the defendant, claimed that he was the third party beneficiary of a contract in which the defendant sold a large tract of

argues, the benefit to the United States is explicitly referenced in the Agreements at issue, and clearly creates an unequivocal intent to benefit the United States.  See Covenant Not to Sue Agreement ¶ 1(A)(b) ("[Plaintiff] agrees not to sue or join any action seeking compensation from, and will not participate with and will withdraw from any class action seeking compensation from . . . The United States of America or any of its departments or agencies with respect to the Highline CITU.").  Moreover, the government contends, the provision in the Agreements here "admit[] of no other interpretation" than that the United States was the "direct and only" beneficiary of plaintiffs' clear promise not to sue the United States.  As such, the government argues, the United States would be "reasonable in relying on the promise" made by plaintiffs not to sue the United States. Restatement (Second) Contracts § 302 cmt. d.

The government also relies on a case in the Eastern District of New York, which holds in similar factual circumstances that a release of claims can involve a third party beneficiary.[23]  In Noveck v. PV Holdings Corp., 742 F. Supp. 2d 284, 295-98 (E.D.N.Y. 2010), Mr. Noveck sued a car manufacturer and a rental car company after sustaining injuries in a car accident while driving a rental car.  Mr. Noveck resolved his claims

_____

land to the Nature Conservancy.  That contract explicitly required the defendant to convey a particular parcel to the plaintiff.  Id. at 333 (The contract required that "At or before the Closing, [defendant] shall convey or cause to be conveyed to [plaintiff] . . . the parcel[ ] described in Exhibit C–1.").  Applying the Restatement standard, the court found that the provision requiring the conveyance "admits of no other interpretation than that plaintiff's right to the conveyance provided for in the contract is appropriate to effectuate the intention of the parties and that the promisee (the Nature Conservancy) intended to give plaintiff the benefit of the conveyance." Id. at 334.

[23] Decisions of New York federal courts are not binding on this court, although they are persuasive authority because they interpret New York law.  Both plaintiffs and the government rely on case law generated by the New York federal courts.

against the manufacturer in a settlement agreement, wherein Mr. Noveck agreed that any claims he brought against the rental car company would not be based on strict liability but would be based only on the rental car company's independent negligence (thereby eliminating the manufacturer's potential indemnification liability to the rental car company).  Id. at 295.  Despite this settlement agreement, Mr. Noveck sued the rental car company based on a theory of strict liability, and the rental car company, asserting third party beneficiary status, sought to enforce the release provision of the settlement agreement as to the strict liability claim.  Id.  The district court held that it was clear based on the language of the settlement agreement between the plaintiff and the car manufacturer that the rental car company was an intended third party beneficiary of the settlement agreement, and that the release provision in the settlement agreement "was plainly intended to eliminate [the manufacturer's] potential liability to [the rental car company] by preventing Plaintiff, in consideration of a large sum of money, from pursuing claims in strict liability against [the rental car company.]"  Id. at 298.

Like the parties in Noveck, the government argues, the City in this case reached an agreement with plaintiffs that included a provision protecting the United States from suit. The government asserts that, like the Noveck court, this court should enforce the clear language in that provision.  The government further argues that Noveck also clarifies that even where the promisee of an agreement (in Noveck, the manufacturer; here, the City) would benefit from a promise to a third party by avoiding indemnification liability, the third party may still be considered an "intended beneficiary."  See Noveck, 742 F. Supp. at 298 (relying on the analysis in Spanierman Gallery v. Merritt, No. 00 Div. 5712, 2004

WL 1781006, at *12 (S.D.N.Y. Aug. 10, 2004) ("That [the promisee] would also benefit

from [a release of claims against a third party] does not militate against the conclusion

that [the promisor] undertook an obligation to the third party.")).[24]   This holding is

supported by a New York law treatise on contracts, which states that an explicit reference

to a benefit to a named third party in a contract usually means that party is a third party

beneficiary of the contract, even if the contract also works to the advantage of one of the

parties to that contract:  "Where the terms of the contract necessarily require the promisor

to confer a benefit upon a third person, then the contract contemplates a benefit to that

third person, and this is ordinarily sufficient to justify third-party-beneficiary

enforcement of the contract, even though the contract also works to the advantage of the

immediate parties thereto."  22 N.Y. Jur. 2d Contracts § 313 (2012).

The government finally argues that, apart from the plain language of the

Agreements, the circumstances surrounding the agreements demonstrate that the City

intended to prohibit suits for compensation against the United States related to the High

Line CITU and that the parties intended to give the United States the benefit of plaintiffs'

promise not to sue.

---

[24] The government also cites other cases where the federal courts of New York have held that
explicit references to third parties as beneficiaries confer third party beneficiary status.  See, e.g.,
Bekhor v. Bear, Stearns and Co., Inc., No. 96 Civ. 4156, 2004 WL 2389751, at *4 (S.D.N.Y.
Oct. 25, 2004) (unpublished) (holding that a third party could enforce a release provision found
in a settlement agreement, explaining that because the third party "is expressly named in
paragraph 8 [of the agreement], there is no question that the release applies to it"); Levin v. Tiber
Holding Corp., 277 F.3d 243, 249 (2d Cir. 2002) (upholding a district court decision finding a
third party was an intended beneficiary, in part because the agreement at issue "specifically
included [the third party] as a direct beneficiary").

First, the government argues, a rezoning summary, dated November 22, 2004 and purporting to describe "the major aspects of the proposed Special West Chelsea District rezoning and conversion of the Highline to public space as set forth in the proposed Term Sheet between CPO [Chelsea Property Owners], the City, the State and the Railroads," shows that at least some of the plaintiffs understood that the deal required High Line property owners to release all claims against the United States.  Toback Dep., Ex. 4 (the rezoning summary stating that the property owners "will be asked to (a) release all claims against CPO [Chelsea Property Owners], the City, the State, the Federal government and the Railroads, including condemnation claims").  The government argues that this summary shows that the parties intended to release the United States from condemnation claims in the final Covenant Not to Sue Agreements and as part of the overarching High Line negotiations.

Second, the government contends that, as Senior Counsel Gunn explains in his declaration, the City intended the United States to benefit from plaintiffs' promise not to sue it, because the City "was aware of the potential for litigation against the United States," and intended "to generally settle all matters related to the CITU."  Gunn Decl. ¶ 21.  "In keeping with the City's desire to settle all matters related to the CITU, the owners of the properties north of 16th Street agreed not to sue the United States of America for compensation in connection with the CITU."  Id.  Because the City intended to settle all claims related to the High Line CITU, the government argues, it intended to benefit the United States.

29

### 3.      Plaintiffs' response.

In response to the case law and undisputed evidence presented by the government, plaintiffs assert that the government misinterprets the Agreements at issue and misapplies the law of New York.  Turning first to the language of the Covenant Not to Sue Agreements, plaintiffs argue that, when read as a whole, it is not possible to conclude that the City and property owners negotiated, designed, and drafted the Agreements for the purpose of conferring upon the United States the benefit of relieving it of its constitutional obligations under the Fifth Amendment.  Rather, plaintiffs argue, the covenant not to sue clause was based on the desire of the City to protect only itself from possible liability.

Specifically, plaintiffs argue that the prologue to the Agreements indicates that the benefits of the Agreements were for the City only.  See, e.g., Gunn Decl., Ex. B ("WHEREAS, [plaintiff], desiring to encourage, induce and cooperate with said initiatives [conversion of the High Line to public space and the creation of the Special District], has agreed to grant certain releases, waivers and covenants to the City in furtherance thereof." (emphasis added)).  The City could have included the United States in this prologue, plaintiffs argue, but did not.  In addition, plaintiffs contend, the United States is mentioned only once in the Agreements.  Moreover, the Agreements contain no provision by which the federal government may enforce any provision of the Agreements, while containing detailed provisions specifying how and to whom any notice is to be made for a purported violation of the Agreements.

Plaintiffs also focus their argument on the term "beneficiary" or "benefit." The word "beneficiary" and the term "third party beneficiary" appear nowhere in the Agreements, demonstrating, plaintiffs assert, that the parties did not contemplate granting third party beneficiary status to the United States. Plaintiffs further argue that the only reference to "benefit" in the Agreements is in the following context, which does not include the United States: "This Agreement shall be binding upon and inure to the benefit of the City and [plaintiff], and their respective heirs, personal representatives, successors and assigns." See, e.g., Gunn Decl., Ex. B ¶ 12. If the parties truly intended to benefit the federal government, plaintiffs contend, they would have expressly stated this fact. By way of contrast, plaintiffs point to a 2009 agreement between plaintiff 437-51 West 13th Street LLC and CSX where the City is expressly made a third party beneficiary. Pls.' Resp., Ex. F at 5 ("If Owner shall breach any of Owner's covenants not to sue CSXT and the city defends and/or indemnifies CSXT for such claim, then, in any such instance, the City shall be deemed to be a third party beneficiary of the releases, waivers and covenants made by Owner to CSXT . . . .").

Moreover, plaintiffs argue, the circumstances surrounding the Agreements demonstrate that the government was not an intended beneficiary of the Agreements. First, plaintiffs assert, no agency of the federal government was involved in the negotiation or drafting of these Agreements. Furthermore, plaintiffs argue that the evidence shows that the City more generally came to the entire deal motivated by political interest or neighborhood development interest, not by a desire to benefit the United States. Gunn Decl. ¶¶ 8-9 (discussing the political shift and the idea to revitalize

31

the neighborhood); Pls.' Resp., Ex. D., p. 437-51-US002742 (testimony of New York

City Planning Commission Chairperson Amanda Burden stating, "We see this special

district not only as providing an extraordinary public amenity but also as an enormous

opportunity, an enormous economic development opportunity for the City of New

York").  **P**laintiffs also argue that Mr. Gunn's declaration does not explicitly state that the

City intended to benefit the United States; rather, the declaration merely indicates that the

City wanted to protect itself from liability, and generally settle all matters in connection

with the CITU.  Plaintiffs assert that the City inserted the language protecting the United

States from suit in the Agreements to protect itself should the federal government seek

indemnification from the City for any litigation resulting from the High Line.[25]  Pls.'

Resp. at 19.

Turning to New York case law, plaintiffs argue that the New York and federal

cases relied on by the government are inapposite to the present situation.  Plaintiffs argue

that, unlike the third party beneficiary in Rekis, the United States is not the "direct and

only beneficiary" of the promise not to sue the United States.  Here, the City is also

explicitly named in the covenant not to sue provision, which is therefore geared toward

protecting the City, not the federal government.  Plaintiffs further argue that Edge is

distinguishable from this case, because one of parties to the agreement in Edge was an

organization meant to "act[] on behalf" of the party that was found to be a third party

beneficiary.  Edge Mgmt., 807 N.Y.S.2d at 359.  Here, by contrast, New York City does

---

[25] Plaintiffs do not provide any evidence in the form of an affidavit from a City official or
otherwise to support this assertion by counsel.

not exist to represent or act on behalf of the United States.  Finally, plaintiffs distinguish Noveck[26] by arguing that (1) there are no indemnification implications in this case, (2) that Noveck involved a release of specific claims, not a covenant not to sue, and (3) that Noveck is a statement of New York law by a federal trial court and as such is not precedential authority for this court.

Instead, plaintiffs argue, New York case law supports their position that the United States is not a third party beneficiary.  Plaintiffs rely on Chavis v. Klock, 846 N.Y.S.2d 490 (N.Y. App. Div. 2007), as the only New York case involving a situation where a purported third party beneficiary sought to enforce a covenant not to sue clause.  In Chavis, a deliveryman signed a covenant not to sue customers or clients of his employer for injuries that were covered under workers' compensation statutes.  Id. at 491.  The express language of the covenant not to sue stated that the covenant was made "[i]n recognition of the fact that any work related injuries which might be sustained by [plaintiff] are covered by [such] statutes, and to avoid the circumvention of such state statutes which may result from suits against the customers or clients" of the employer. Id. (citation omitted).  When the deliveryman later sued a customer and the customer sought to dismiss the case based on the above-cited language, the New York appellate court held that the customer was not a third party beneficiary of this contract, because the

---

[26] As noted above, in Noveck, a rental car company was held to be a third party beneficiary of a promise between the plaintiff and a car manufacturer, made in a settlement agreement, where the plaintiff promised only to bring independent negligence claims, rather than strict liability claims, against the rental car company, so that the rental car company would not seek indemnification from the car manufacturer.  742 F. Supp. 2d 284, 290, 295-98 (E.D.N.Y. 2010).

covenant manifested an intent, not to benefit the customer, but to protect the employer

"against possible third-party actions by alleged tortfeasors."  Id. at 491-92.

Like the customer in Chavis, plaintiffs argue, the United States should be

considered only an incidental beneficiary.  Moreover, plaintiffs point out, Chavis is the

only New York case involving a third party beneficiary and covenant not to sue, and the

court explicitly rejected third party beneficiary status.  Based on this and other cited

authorities, plaintiffs argue that the United States is clearly only an incidental, not

intended, beneficiary of the Covenant Not to Sue Agreements under New York law.[27]

---

[27] Plaintiffs also rely on Common Fund for Non-Profit Orgs. v. KPMG Peat Marwick, LLP, 951 F. Supp. 498 (S.D.N.Y. 1997), where an investment broker claimed it was a third party beneficiary of a contract between an organization that it serviced and an accounting firm.  In the contract, the accounting firm was to perform auditing services relating to the broker's activities. Because the accounting firm was hired to audit the broker's activities, which would not necessarily benefit the broker, the court rejected the broker's claim.  The court stated that the "allegations suggest that the agreement was for the primary benefit and protection of [the organization,] with at most a secondary intent . . . to benefit [the broker.]"  Id. at 500.  Plaintiffs further rely on State of California Public Employees Retirement System v. Shearman & Sterling, 741 N.E.2d 101 (N.Y. 2000), where New York's highest court rejected an argument by the California pension system that, as an assignee of a loan, it was a third party beneficiary of a law firm's contract with the assignor to provide legal services relating to that loan.  The court found that the law firm was hired to assist the assignor, and that the California pension system and the assignor "did not share at all times the same interests."  Id. at 105.

Here, plaintiffs argue that, like the broker in Common Fund, the City was the primary beneficiary of the Agreements, and the United States was merely an incidental beneficiary. Moreover, plaintiffs argue, as in Shearman & Sterling, the City and the United States did not share the same interests with respect to the City's interactions with the landowners.  Plaintiffs assert that there is no evidence that the federal government had any interest in those dealings, because there is no evidence that the federal government participated in any of the negotiations at all.  Pls.' Resp., Declaration of Mark F. (Thor) Hearne ¶¶ 5-7 (confirming no evidence of involvement of United States in negotiating the Agreements); see also 243-249 Holding Co. v. Infante, 771 N.Y.S.2d 651, 652 (N.Y. App. Div. 2004) (a brief opinion suggesting that in determining third party beneficiary status courts may consider whether the third party beneficiary took part in the negotiations between the other parties).

###### 4. Discussion

After consideration of the parties' arguments and the law of the State of New York regarding third party beneficiaries, the court agrees with the government that the plain language of and undisputed circumstances surrounding the Covenant Not to Sue Agreements indicate that the parties intended to directly benefit the United States under New York law, and that the United States is therefore a third party beneficiary to the Covenant Not to Sue Agreements. As discussed below, the express language of the Agreements demonstrates the parties' clear intent that plaintiffs would not sue the United States in connection with the High Line CITU. Under New York law, this clear language conveys third party beneficiary status on the United States unless a different intent can be gleaned from the language of the Agreements or the surrounding circumstances. The fact that the United States is not more specifically referenced as a third party beneficiary and participated in neither the drafting nor negotiations does not demonstrate a different intent that defeats third party beneficiary status under New York law. In addition, as demonstrated by <u>Noveck</u>, the fact that the City could also benefit from plaintiffs' promise not to sue the United States does not render the United States an "incidental beneficiary." While <u>Chavis</u> suggests that an alternate intent can limit contractual language that directly

---

Plaintiffs also cite <u>2470 Cadillac Res., Inc. v. DHL Exp. (USA), Inc.</u>, 923 N.Y.S.2d 530, 531 (N.Y. App. Div. 2011), where franchisees alleged third party beneficiary status as third party resellers under an agreement between the franchisor and an express courier service which authorized use of third party resellers. The court rejected the franchisees' argument because the authorization of the use of third party resellers was meant to only directly benefit the franchisor and the courier service by generating revenues for both, and any benefit flowing to the franchisees was an "incidental by-product." <u>Id.</u> Here, plaintiffs contend, any benefit to the United States from the Agreements would be an "incidental by-product" of the Agreements.

conveys a benefit on a third party in the form of a promise not to sue, plaintiffs have provided no showing of an alternate intent on the part of the parties here, either in the language of or the circumstances surrounding the Covenant Not to Sue Agreements.  For all of these reasons, as discussed in more detail below, the court finds that the United States may enforce the Covenant Not to Sue Agreements as a third party beneficiary under New York law.

The main question before the court is whether the government has met its burden of showing that recognition of the United States as a third party beneficiary would be appropriate to effectuate the intention of the parties in these particular Agreements.  See Restatement (Second) Contracts § 302.  Under New York law, the terms of an agreement are the best evidence of the parties' intent, Edge Mgmt., 807 N.Y.S.2d at 358, and the language of the Agreements here plainly and explicitly bestows a benefit—plaintiffs' promise not to sue—on the United States.  In the Agreements, plaintiffs agreed "not to sue or join any action seeking compensation from, and will not participate with and will withdraw from any class action seeking compensation from the City or The United States of America or any of its departments or agencies with respect to the Highline CITU."  See Covenant Not to Sue Agreement ¶ 1(A)(b).  This express language demonstrates that the parties intended to directly benefit the United States, and that the United States would "be reasonable in relying on [this] promise" not to sue.  Restatement (Second) Contracts § 302 cmt. d.

That the United States is only mentioned once in the Agreements, or that the parties to the Agreements did not more explicitly state that the United States was a "third

party beneficiary," does not change the clear intent of the parties expressed by this

language.  Under New York law, a third party need not even be explicitly identified in a

contract to be a third party beneficiary, so long as the party can show the intent to benefit

it.  Strauss v. Belle Realty Co., 469 N.Y.S.2d 948, 950 (N.Y. App. Div. 1983) ("[I]t is not

necessary that a third-party beneficiary be identified or even identifiable at the time that

the contract is made . . . .").  In addition, the fact that the United States did not participate

in the negotiations or drafting of the Agreements does not render the United States an

"incidental beneficiary" rather than a third party beneficiary.  It is well-settled law that a

third party beneficiary need not know of the agreement to be able to enforce the benefit.

22 N.Y. Jur. 2d Contracts § 311 ("New York follows the nearly universal rule that a third

person may, in his or her own right and name, enforce a promise made for his or her

benefit even though he or she is a stranger both to the contract and to the consideration.").

Moreover, as the government points out, the STB was aware of the negotiations between

the Chelsea Property Owners, the City, and CSX, and was provided a copy of the draft

High Line Term Sheet during the proceedings before it.  Def.'s Reply, Declaration of

Alan Weinstein, Attorney Advisor with the STB, Ex. 11.

　　　The court also disagrees with plaintiffs' argument that, because the City would

also benefit from the Agreements, the United States was merely an "incidental

beneficiary."  The court agrees with the Noveck court, which held that a party to a

contract and a third party beneficiary may both benefit from a promise not to sue, without

rendering the third party an "incidental beneficiary."[28]   Although plaintiffs argue that the City was attempting to protect itself from any indemnification liability by including the covenant not to sue clause in the Agreements, they provide no evidence of such an intent beyond this bare assertion.   However, even if the City would also benefit from plaintiffs' covenant not to sue the United States, under Noveck, that benefit would not erase the clear intent of the parties to bar any claims against the United States in connection with the High Line CITU.   Aside from citing some evidence that the overall High Line deal was supported by the City for political or neighborhood revitalization reasons, plaintiffs have provided no evidence that the covenant not to sue clause itself was included in the Agreements for a purpose different from that expressed by the clear language of that provision.

Moreover, contrary to plaintiffs' contentions, the court finds that Chavis, the only case in New York state court expressly addressing a third party beneficiary and covenant

---

[28] While Noveck is only persuasive authority, its holding is supported by a New York law treatise, 22 N.Y. Jur. 2d Contracts § 313 ("Where the terms of the contract necessarily require the promisor to confer a benefit upon a third person, then the contract contemplates a benefit to that third person, and this is ordinarily sufficient to justify third-party-beneficiary enforcement of the contract, even though the contract also works to the advantage of the immediate parties thereto.").

In addition, although Noveck involves a settlement and release, not a covenant not to sue, the court finds that this difference does not affect the central holding of that case regarding third party beneficiary status.  Similarly, the court rejects plaintiffs' argument that Edge is distinguishable because the promisee in Edge had a duty to act on behalf of the third party beneficiary in that case.  The courts of New York no longer require a promisee to owe a duty to a third party for the third party to be an intended beneficiary.  McClare v. Mass. Bonding & Ins. Co., 266 N.Y. 371, 379 (1935) ("The requirement of some obligation or duty running from the promisee to the third party beneficiary has been progressively relaxed until a mere shadow of the relationship suffices, if indeed it has not reached the vanishing point.").

not to sue, is distinguishable from the present case.  In <u>Chavis</u>, the New York appellate court found that the particular language of the covenant not to sue at issue—under which a worker promised not to sue the customers of his employer "[i]n recognition of the fact that any work related injuries which might be sustained by [plaintiff] are covered by [workers' compensation] statutes, and to avoid the circumvention of such state statutes which may result from suits against the [employer's] customers or clients"—was intended to benefit the employer, not to bestow third party beneficiary status on a customer.  846 N.Y.S.2d at 491.  Unlike the contract language in <u>Chavis</u>, the contract terms here evince clear intent to benefit the United States specifically, and contain no other language expressing a different intent.  <u>See</u> Covenant Not to Sue Agreement ¶ 1(A)(b) ("[Plaintiff] agrees not to sue or join any action seeking compensation from, and will not participate with and will withdraw from any class action seeking compensation from . . . The United States of America or any of its departments or agencies with respect to the Highline CITU.").  The court therefore finds the situation in <u>Chavis</u> distinguishable from the present case.

Moreover, the surrounding circumstances indicate that all parties knew of the possibility of suits against the United States and that waivers of those suits would be part of the overarching agreement concerning the High Line.  A summary describing "the major aspects of the proposed Special West Chelsea District rezoning and conversion of the Highline to public space" shows that at least some of the plaintiffs understood that the deal required property owners to release all claims against the United States.  Toback Dep., Ex. 4.  That summary sheet stated that the High Line property owners, including

plaintiffs, would "be asked to (a) release all claims against . . . the Federal government . .
. including condemnation claims." Id.  The summary demonstrates that the High Line
stakeholders, including plaintiffs, intended that the final Agreements would include a
waiver of claims against the United States.  See Restatement (Second) Contracts § 302(1)
(the first part of the Restatement test used by New York courts, stating that "a beneficiary
of a promise is an intended beneficiary if recognition of a right to performance in the
beneficiary is appropriate to effectuate the intention of the parties . . ." (emphasis added)).

In addition, the government has shown that the City intended to give the United
States the benefit of the promise not to sue the United States.  See id. (the second part of
the Restatement test, stating that "a beneficiary of a promise is an intended beneficiary if
. . . the circumstances indicate that the promisee intends to give the beneficiary the
benefit of the promised performance" (emphasis added)).  As Senior Counsel Gunn
explains in his declaration, the City intended the United States to benefit from plaintiffs'
promise not to sue it:  "In keeping with the City's desire to settle all matters related to the
CITU, the owners of the properties north of 16th Street agreed not to sue the United
States of America for compensation in connection with the CITU."  Gunn Decl. ¶ 21.  As
noted, plaintiffs have failed to provide any evidence to generate a factual dispute as to the
City's intent in connection with the covenant not to sue clause, aside from bare assertions
that the City intended to benefit itself.  These assertions, however, are not enough to
create a genuine dispute as to the intent of the parties to the Agreements.  See Pure Gold,
Inc. v. Syntex (U.S.A.), Inc., 739 F.2d 624, 626-27 (Fed. Cir. 1984).

For all of these reasons, the court finds that the United States was an intended beneficiary of plaintiffs' promise in the Covenant Not to Sue Agreements not to seek compensation from the United States in connection with the High Line CITU.  The United States may therefore enforce the Agreements in this action as a third party beneficiary.

###### C.    The waiver in the Covenant Not to Sue Agreements applies to both the recreational trail and "railbanking" portion of the CITU, and the waiver term therefore entirely bars plaintiffs' takings claims.

The court next turns to whether the clause prohibiting suit against the United States in the Covenant Not to Sue Agreements bars plaintiffs' claims in this case.  The covenant not to sue clause in the Agreements states that plaintiffs "agree[] not to sue or join any action seeking compensation from, and will not participate with and will withdraw from any class action seeking compensation from . . . The United States of America or any of its departments or agencies with respect to the Highline CITU." Covenant Not to Sue Agreement ¶ 1(A)(b).  Plaintiffs do not dispute that, if enforceable and not otherwise limited, this language applies to their Fifth Amendment takings claims here.  Rather, plaintiffs argue that, even if the United States is a third party beneficiary, the covenant not to sue clause impacts only the "recreational trail" component of the taking because the Agreements expressly exclude any release of the "railbanking" component of the taking—the component of the taking that involves the STB's right to reinstate rail service over the High Line in the future.  Under the Trails Act, a railroad may relinquish responsibility for a rail line by transferring the corridor to an entity that will use it as a recreational trail.  Although the corridor is not used as a railroad during

41

this period of interim trail use, it remains intact for potential future use for rail service. The process by which a rail corridor is reserved for future rail service is called "railbanking."  See Caldwell v. United States, 391 F.3d 1226, 1228-29 (Fed. Cir. 2004). An easement under the Trails Act is therefore used as a recreational trail and also "railbanked" for future rail service.

Plaintiffs seek to draw a distinction between their covenant not to sue the United States for "railbanking" the High Line easement and their covenant not to sue the United States for creating the "recreational trail" portion of that easement.  Specifically, plaintiffs argue that the Covenant Not to Sue Agreements expressly reserve to plaintiffs the right to be compensated should "future restoration of rail service" occur.  Thus, plaintiffs argue, even if the covenant not to sue clause bars plaintiffs from bringing a takings claim for the creation of a recreational trail across their property, the portion of their Fifth Amendment takings claims involving the "railbanking" of an easement across their property (which contemplates potential reactivation of rail service) is not barred by the Agreements.

Plaintiffs rely on paragraph 1(B) of the Agreements, which lists exclusions to the covenant not to sue clause, to support their interpretation of the covenant.  That provision states in pertinent part:

> Notwithstanding anything contained in this Agreement to the contrary, the City and [plaintiff] acknowledge and agree that (I) neither [plaintiff] nor its successor and assigns are releasing and/or discharging the City or its designee . . . from any claims or damages relating to or arising in any manner whatsoever out of . . . any claim for any matter described in Subparagraph (A) of this Section I to the extent that it arises from and after the date of restoration of rail service by the City or its designee on or over

the Highline or any segment thereof . . . which . . . passes over all or any
part of [plaintiff's property.]

Toback Dep., Ex. 5 ¶ 1(B).  Plaintiffs argue that this reservation allows them to bring a

takings claim today against the federal government for authorizing future reactivation of

rail service through the "railbanking" of their property under the Trails Act.

The government contends that the plain language of the Agreements belies

plaintiffs' argument.  The government asserts that by its terms, paragraph 1(B) applies

only to the City or its designee, and that reservation of the claim based on reactivation of

rail service in the Agreements applies only "to the extent that it arises from and after the

date of restoration of rail service by the City," not before rail service is restored.

Therefore, the government argues, the reservation of claims in paragraph 1(B) does not

impact plaintiffs' covenant not to sue the United States.

The court finds that plaintiffs' argument is not supported.  First, the reservations

relied on by plaintiffs are drafted to apply only to claims against the City or its designee.

Moreover, the purpose of the reservation is to preserve claims that may arise after rail

service is reactivated, not today.  Regardless of whether plaintiffs may have some right

against the City or the United States in the future in connection with a possible decision

to reactivate the rail line, plaintiffs cannot make that claim now.  Any takings claims

against the United States based on actual rail use in the future (as opposed to the

imposition of "railbanking" now) are plainly not ripe.  See, e.g., Anaheim Gardens v.

United States, 444 F.3d 1309, 1315 (Fed. Cir. 2006) ("A claim for an uncompensated

regulatory taking, however, must be ripe, meaning that it is the result of a 'final decision'

by the allegedly offending agency."). The claim may be ripe only when a decision to reactivate rail service is made. Finally, this court has repeatedly held that the scope of the taking associated with the issuance of a CITU includes both trail use and "railbanking." See, e.g., Jenkins v. United States, 102 Fed. Cl. 598, 619 (2011); Burgess v. United States, No. 09-242L, 2013 WL 474875 (Fed. Cl. Feb. 7, 2013) (also listing other cases in accord). Here, the Agreements' language barring plaintiffs' claims against the United States is expressly tied to the "CITU," and thus bars claims for both "railbanking" and trail use. Covenant Not to Sue Agreement ¶ 1(A)(b).

In sum, because the unambiguous language of the Covenant Not to Sue Agreements bars plaintiffs from seeking compensation from the United States "with respect to the High Line CITU," id., the court finds that the Agreements operate to bar plaintiffs from bringing any Fifth Amendment takings claims in this case—claims related to trail use together with "railbanking."

**D.    The waiver does not constitute an "unconstitutional condition."**

Plaintiffs in their final argument assert that even if the United States is an intended third party beneficiary of the Agreements, the covenant not to sue clause in the Agreements is unenforceable because it is unconstitutional. Plaintiffs argue that, by requiring plaintiffs to surrender their constitutional right to just compensation, the Agreements violate the "doctrine of unconstitutional conditions," as applied by the Supreme Court to government land use exactions in Nollan v. Cal. Coastal Comm'n, 483 U.S. 825 (1987), and Dolan v. City of Tigard, 512 U.S. 374 (1994). As such, plaintiffs

44

contend, the waivers of their Fifth Amendment rights in the Agreements are unenforceable.

Under the doctrine of unconstitutional conditions, "the government may not require a person to give up a constitutional right . . . in exchange for a discretionary benefit conferred by the government where the benefit sought has little or no relationship to the property." Dolan, 512 U.S. at 385.  In Nollan and Dolan, the Supreme Court established a two-part test, based on the doctrine of unconstitutional conditions, to analyze the constitutionality of land use exactions[29] imposed by the government as a condition on development.  Under the Nollan/Dolan test, a land use exaction is constitutional only if an "essential nexus" exists between the condition imposed and a legitimate government purpose, and if there is a "rough proportionality" between the required condition and the impact of the proposed development.  Nollan, 483 U.S. at 837; Dolan, 512 U.S. at 391.[30]

Here, plaintiffs argue, the City of New York has imposed a land use exaction on plaintiffs in exchange for the rezoning of the Special District—the requirement that they

[29] Land use exactions occur when a government requires that a property owner dedicate some of his or her property for public use before granting that property owner a permit to develop the land.  See Starr Int'l Co. v. United States, 106 Fed. Cl. 50, 82 n.24 (2012) (citation omitted).

[30] In Nollan, the Court held that a city government could not condition a building permit on the granting of a public easement across a beachfront lot because there was no "essential nexus" between the legitimate state interest (defined by the city as maintaining the public's visual access to the ocean) and the condition imposed (requiring lateral public access across a private lot).  483 U.S. at 837.  In Dolan, 512 U.S. at 391, the Court found that while an "essential nexus" existed between the legitimate state interest (flood and traffic control) and the condition imposed by the City of Tigard on a building permit (the dedication of property for flood control and a pedestrian/bicycle path), the exaction nevertheless failed to pass constitutional muster because there was no "rough proportionality" between the condition and the projected impact of the proposed development.

45

waive their Fifth Amendment claims against the United States.  Plaintiffs contend that this land use exaction fails the Nollan/Dolan test of constitutionality, because plaintiffs' waiver of their claims against the United States has no relationship with the rezoning of West Chelsea or the preservation of the High Line.  The government responds that the standards of Nollan and Dolan are not applicable in this case, and that, even if they are, they have been satisfied.

The court finds that plaintiffs' reliance on the Nollan/Dolan test is wholly misplaced.  Where, as here, plaintiffs voluntarily waived their constitutional rights as part of a voluntary agreement, the doctrine of unconstitutional conditions does not apply.  It is beyond dispute that persons can voluntarily waive their constitutional rights.  For example, in United States v. Mezzanatto, 513 U.S. 196, 200-01 (1995), the Supreme Court held, in the context of discussing the rights of a criminal defendant, that waiver of rights is available "in the context of a broad array of constitutional and statutory provisions."  This includes the voluntary waiver of the right to sue for compensation under the Fifth Amendment.  For example, in The People of Bikini v. United States, 554 F.3d 996, 1000 (Fed. Cir. 2009), the Federal Circuit held that it lacked jurisdiction over the plaintiffs' Fifth Amendment takings claims because they had waived their rights, in a settlement agreement with the United States, to sue over their claims in any United States court.  Similarly, in United States v. 119.67 Acres of Land, 663 F.2d 1328, 1329 n.2, 1330 (5th Cir. 1981), the Fifth Circuit upheld a settlement agreement and resulting judgment where a party to that agreement waived any monetary just compensation claim in exchange for certain actions by the United States.

Here, because plaintiffs agreed not to sue the United States as part of an overall voluntary agreement concerning the creation of the High Line, the court concludes that plaintiffs' waiver of their Fifth Amendment takings claims against the United States with respect to the High Line CITU is not an unconstitutional condition under the principles set forth in Nollan and Dolan.  Unlike those land use exaction cases, the Covenant Not to Sue Agreements at issue here were negotiated over long periods of time between sophisticated business people represented by counsel in connection with a complex plan for development.  The Agreements were voluntarily executed as part of an overall deal in which benefits were given in exchange for certain obligations by all parties.  The Agreements at issue in this case do not involve land use conditions demanded by governments in exchange for permits, which are at the core of the Nollan/Dolan analysis. As the Ninth Circuit held in Leroy Land Development v. Tahoe Regional Planning Agency, 939 F.2d 696, 698 (9th Cir. 1991), the takings analysis under Nollan does not apply to agreements "entered into voluntarily, in good faith and [] supported by consideration."  Id. (holding that Nollan did not apply retroactively to a settlement agreement between the plaintiff and a regional planning authority that gave the plaintiff the right to construct condominium units in exchange for performing certain mitigation measures).  Similarly, in McClung v. City of Sumner, the Ninth Circuit held that where the plaintiffs voluntarily contracted with a city to install a 24-inch storm pipe in exchange for the waiver of certain permit fees, the Nollan/Dolan analysis did not apply.  548 F.3d 1219, 1230 (9th Cir. 2008).  The McClung court found that because the plaintiffs "were not compelled to install a 24-inch pipe, but voluntarily contracted with the City to do so,

there was simply no 'taking' by the City." Id.  Here, too, plaintiffs entered into a voluntary agreement with the City supported by consideration.  The court holds that, for the same reasons articulated in McClung and Leroy, the takings analysis articulated in Nollan and Dolan is inapplicable in this case, and that the subject covenant not to sue clause in the Agreements is not unenforceable as an unconstitutional condition.

## IV.  CONCLUSION

For the foregoing reasons, the court **GRANTS** the government's motion for partial summary judgment as to the claims of (1) all of the plaintiffs in case number 11-333, West Chelsea Buildings, LLC, 22-23 Corp., 26-10 Corp.; and (2) two of the plaintiffs in case number 11-713, Tenth Avenue Realty Associates, LP, and Somatic Realty, LLC, because these five plaintiffs' claims are barred by the Covenant Not to Sue Agreements. The court also **GRANTS** the government's motion for partial summary judgment as to the claim of (3) one of the plaintiffs in case number 11-374, 437-51 West 13th Street LLC, based on a lack of standing.

The only remaining parties in these consolidated cases are Semantic Realty, LLC in case number 11-713 and Romanoff Equities, Inc. in case number 11-374.  The parties shall file a joint status report by **February 28, 2013**, setting forth next steps for further proceedings in this matter.  Because this opinion does not entirely close these consolidated cases, the parties shall continue to file all filings under the lead case, 11-333.

**IT IS SO ORDERED.**                                      s/Nancy B. Firestone
                                                                    NANCY B. FIRESTONE
                                                                    Judge